UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 06-11557-RGS

SITUATION MANAGEMENT SYSTEMS, INC.

v.

LAMOCO CONSULTING, LLC f/k/a
ASP. CONSULTING LLC and
ASP. CONSULTING GROUP

FINDINGS OF FACT AND
RULINGS OF LAW AFTER A
JURY-WAIVED TRIAL

March 30, 2011

STEARNS, D.J.

This case was tried originally in another session of this court in February of

2008.  The case was vacated on appeal and remanded.  *See Situation Mgmt. Sys. v.*

*ASP. Consulting LLC*, 560 F.3d 53, 62 (1st Cir. 2009).  It was then redrawn to this

session.  A second trial was held from March 29, 2010, through April 1, 2010.   By

request, the trial was adjourned to permit the parties to obtain the transcript of the

proceedings and to prepare proposed findings and rulings.  Post-trial briefing concluded

on October 20, 2010.

BACKGROUND

*The Parties*

Plaintiff Situation Management Systems, Inc. (SMS) is a Massachusetts corporation owned by Sharon Malouf and members of her family. Defendant Lamoco Consulting LLC, formerly ASP. Consulting LLC (ASP), is a Massachusetts limited partnership. ASP was founded by three disaffected former employees of SMS – namely Dane Harwood, Alexander Moore, and Alon Shklarek.

*Facts*

The following are the facts as related in the decision of the Court of Appeals.[1]

For more than thirty years, plaintiff Situation Management Systems, Inc. ("SMS") has provided consulting services aimed at improving employee communication and negotiation skills within the workplace. As part of its services, SMS has developed a series of training materials focused on teaching effective communication and negotiation techniques. Companies buy these materials from SMS and use them in employee training workshops. SMS typically charges its clients $200 to $250 per participant for the use of its materials. SMS's clients include Anheuser-Busch, General Mills, NASA, Pfizer, Procter & Gamble, Verizon, and companies abroad.

A number of SMS employees, including Dane Harwood and Alexander Moore, left SMS after Sharon Malouf acquired the company through bankruptcy proceedings in 2001. Following the end of Harwood's noncompete period, Harwood and Moore, along with an executive from a former European sublicensee of SMS, Alon Shklarek, founded defendant ASP. Consulting LLC ("ASP") in 2003. ASP offers training programs similar to SMS's, and the two compete for the same customers.

---

[1] While witnesses at trial testified to the factual background of the case, no material facts were developed that deviated from those recited in the Court of Appeals opinion. The irony of copying verbatim a large swath of text from the First Circuit opinion in deciding a copyright infringement case is not lost.

ASP also has a series of training materials that focus on the same subject matter and teach similar communication and negotiation strategies as SMS's.

SMS claims ASP infringed its copyright in three of SMS's training workbooks: *Positive Power & Influence* ("*PPI*"), *Positive Negotiation Program* ("PNP"), and *Promoting and Implementing Innovation* ("*PII*"). *PPI* was first published in 1976 and is currently in its fourth edition. *PPI* is SMS's most widely circulated work and generates approximately seventy-five percent of SMS's revenues. More than a quarter million people have taken the *PPI* course. *PNP*, now in its third edition, was first published in 1978 and accounts for approximately fifteen percent of SMS's revenues. *PII* was first published in 1993 and is a much smaller part of SMS's business than the other two works at issue. SMS's works contain hundreds of pages of text, flowcharts, and illustrations teaching techniques for communication and negotiation within the workplace.

This suit claims infringement by three of defendant ASP's workbooks: *Communicating 2 Influence* ("*C2I*"), *Negotiating Successful Agreements* ("*NSA*"), and *Championing Ideas* ("*CI*"). SMS claims that ASP's *C2I* infringes its copyright to *PPI*, that *NSA* infringes *PNP*, and that *CI* infringes *PII*. ASP's works address the same topics as SMS's. Considering the circumstances under which ASP developed its materials, the district court found that this similarity was no coincidence. *Situation Mgmt.*, 535 F. Supp. 2d at 235. In particular, Harwood, Moore, and Shklarek each had access to SMS's works prior to forming ASP; Harwood even kept copies of SMS's works in the attic of his home after he left SMS. And Harwood and Moore were intimately familiar with SMS's works, having authored several editions of *PPI*, *PNP*, and *PII* while working at SMS. Moreover, Harwood and Moore together authored each of the allegedly infringing works relatively quickly after forming ASP. For example, they prepared a version of *C2I* over a period of six to thirty-four days.

On September 24, 2003, one of SMS's European licensees contacted Malouf to tell her that ASP's new *C2I* program was the same as SMS's *PPI*. Malouf then visited ASP's website and read a brief description of

*C2I*, which she found strikingly similar to the *PPI* program. Malouf contacted ASP and asked to see ASP's written materials so that she could assess whether SMS had a claim against ASP for copyright infringement. SMS and ASP were unable to reach an agreement regarding the conditions under which Malouf could inspect ASP's works, and Malouf did not view ASP's works before filing suit.

On December 28, 2005, based upon the tip from the European licensee and the information on ASP's website, Malouf believed that SMS had a viable claim of copyright infringement and sued ASP in federal district court in New Hampshire, where SMS has its principal place of business. That suit was ultimately dismissed on August 15, 2006 for lack of personal jurisdiction over ASP.

SMS then sued ASP in the District of Massachusetts on September 1, 2006.

*Situation Mgmt. Sys.*, 560 F.3d at 55-57.

## RULINGS OF LAW

### Law of the Case

The law of the case doctrine has two branches. Under the first, which is permissive and flexible, a court must respect and follow its prior rulings in a case. The second branch, the mandate rule – which controls here – "stringently precludes a lower court from contravening the rulings of a higher court made at an earlier stage of the same controversy." *Conley v. United States*, 323 F.3d 7, 12 (1st Cir. 2003) (en banc); s*ee also Ellis v. United States*, 313 F.3d 636, 646-647 (1st Cir. 2002) (explaining the policy considerations behind the doctrine). A decision of an appellate court on an issue

of law "establishes the law of the case and it *must* be followed by the trial court on remand." *United States v. Rivera-Martinez*, 931 F.2d 148, 150 (1st Cir. 1991) (emphasis in original). *See also Commercial Union Ins. Co. v. Walbrook Ins. Co.*, 41 F.3d 764, 769 (1st Cir. 1994).

## Controlling Law

To establish copyright infringement, a plaintiff must show: (1) ownership of a valid copyright in a work; and "(2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co., Inc.*, 499 U.S. 340, 361 (1991); *Lotus Dev. Corp. v. Borland Int'l, Inc.*, 49 F.3d 807, 813 (1st Cir. 1995). A plaintiff bears the burden of proving "that the work as a whole is original and that the plaintiff complied with applicable statutory formalities." *Id.* Original does not mean novel. "[T]he requisite level of creativity is extremely low; even a slight amount will suffice." *Feist*, 499 U.S. at 345. Whether or not a work is original is a question that a court can determine as a matter of law. *See CMM Cable Rep, Inc. v. Ocean Coast Props., Inc.*, 97 F.3d 1504, 1517 (1st Cir. 1996) (affirming summary judgment on the originality of a promotional contest theme, stating "[w]hile we do not dispute that the question of originality can be a question of fact for the jury, it is not necessarily so."); *see also Feist*, 499 U.S. at 341 (deciding a question of originality as a matter of law).

"Case law supports the 'ordinary observer' test and the disregard of minor

differences in favor of major similarity." *Matthews v. Freedman*, 157 F.3d 25, 28 (1st Cir. 1998). Major or substantial similarity exists "if a reasonable, ordinary observer, upon examination of the two works, would 'conclude that the defendant unlawfully appropriated the plaintiff's protectable expression.'" *T-Peg, Inc. v. Vermont Timber Works, Inc.*, 459 F.3d 97, 112 (1st Cir. 2006) (citation omitted). "[D]e minimis copying is best viewed not as a separate defense to copyright infringement but rather as a statement regarding the strength of the plaintiff's proof of substantial similarity." *Situation Mgmt. Sys.*, 560 F.3d at 59.

### First Circuit Holding and The Mandate

In its decision, the First Circuit summarized the fundamental errors in the district court's prior analysis.

> Here, the district court improperly denied copyright protection to large portions of SMS's works because it, in an error of law, found "they focus on concepts and teach a noncopyrightable process." *Situation Mgmt.*, 535 F. Supp. 2d at 240; *see also id.* at 241 (finding that "the structure or essence of SMS's works is not copyrightable" because, unlike a work of fiction that has a plot and characters, they merely discuss processes and ideas). The fact that SMS's works describe processes or systems does not make their *expression* noncopyrightable. *See Feist*, 499 U.S. at 350-51, 111 S. Ct. 1282 (holding that a factual compilation may be entitled to copyright protection if it features an original selection or arrangement of facts even though the underlying facts themselves are noncopyrightable). SMS's creative choices in describing those processes and systems, including the works' overall arrangement and structure, are subject to copyright protection. *See id.* (recognizing that the original selection and arrangement of noncopyrightable elements is entitled to copyright

protection). The district court's analysis did what we cautioned against in *CMM Cable*, 97 F.3d at 1515: it lost sight of the expressiveness of the works as a whole by focusing too closely on their noncopyrightable elements.

Because the original selection and arrangement of noncopyrightable elements is itself copyrightable, the district court also erred in limiting the narrow copyright protection it allowed for SMS's works "to little more than [their] original text and formatting." *Situation Mgmt.*, 535 F. Supp. 2d at 241. There are numerous ways to teach the concepts and processes disclosed in SMS's works and so SMS need not show "'near identity' between the works at issue" to prove copyright infringement. *Concrete Mach. Co. v. Classic Lawn Ornaments, Inc.*, 843 F.2d 600, 606 (1st Cir. 1988) (quoting *Sid & Marty Krofft Television Prods., Inc. v. McDonald's Corp.*, 562 F.2d 1157, 1167 (9th Cir. 1977)).

*Situation Mgmt. Sys.*, 560 F.3d at 61-62.

The court then remanded the case with the following instructions.

The district court's analysis of substantial similarity improperly excluded from consideration large portions of SMS's works under the mistaken belief that they are unoriginal or a noncopyrightable process or system, making its assessment of substantial similarity clearly erroneous. We leave undisturbed the district court's finding of actual copying and hold, as a matter of law, that SMS's works both satisfy the originality requirement for copyright protection and are entitled to protection beyond the textual level even though they describe processes and systems. We leave the analysis of the question of substantial similarity between SMS's and ASP's works within the framework we have outlined to be addressed on remand.

*Id.* at 62.

Thus, the only task before the court is to determine whether SMS has met the "substantial similarity" test, and, if it has, the damages and other relief to which it is

entitled.

### *Finding of Substantial Similarity*

As described by SMS, the focus of its works is on corporate training with syllabi directed at "(i) promoting innovations internally; (ii) successful negotiation, and (iii) promoting one's influence inside an organization." As identified by the First Circuit and SMS, the accused ASP publications found to copy from SMS's works are *C2I*, *NSA*, and *CI*. The only reasonable approach in applying the "ordinary observer" test is to do exactly that. I have compared the three SMS workbooks at issue, *PPI*, *PNP*, and *PII*, side-by-side with the accused workbooks. Based on that comparison, I easily conclude that the copying is substantial.[2] Three representative selections from the many offered in evidence by SMS will suffice.

---

[2] This is not to say that there are no differences. In describing *NSA*, for example, Harwood pointed out that it includes a "purpose-value" statement and a list of "do's and don'ts," while *PNP* does not. These are differences, however, without a distinction. *See Segrets, Inc. v. Gillman Knitwear Co., Inc.*, 207 F.3d 56, 65-66 (1st Cir. 2000) (affirming the district court's findings that two of defendant's sweater designs were, as a matter of law, substantially similar to plaintiff's copyrighted design, where the designs differed in but a few details); *Concrete Mach. Co.*, 843 F.2d at 608 ("Slight or trivial variations between works will not preclude a finding of infringement under the ordinary observer test.").

| ASP's "NSA" | SMS's "PNP" |
|---|---|
| This pre-work assignment is an important beginning . . . | A crucial beginning: the pre-program assignment . . . |
| • What are my interpersonal negotiating strengths? | • What are my strengths? |
| • What are my shortcomings, if any? | • What are my shortcomings, if any? |
| • Are there potentially useful negotiation skills that I do not use? | • Are there potentially useful negotiation skills that I do not use? |
| • Which aspects of internal and external negotiations do I perform particularly well? Which not so well? | • Which aspects or parts of a negotiation do I perform particularly well? Which not so well? |
| Tr. Ex. 125, p. 5 | Tr. Ex. 125, p. 5 |

| | |
|---|---|
| 5 point scale self-assessment for negotiation skills, ranging from "seldom" to "frequently"<br><br>Tr. Ex. 125, p. 6 | 5 point scale self-assessment for negotiation style, ranging from "Not very characteristic" to "Very characteristic"<br><br>Tr. Ex. 125, p. 6 |

| Representative self-assessment questions: | Representative self-assessment questions: |
|---|---|
| 1(e): Ask questions in a way that encourages the participation of the other negotiator. | ISQ 18: Ask for contributions from individuals to encourage participation in a discussion. |
| 2(a): Give the other negotiator time to respond completely. | NSQ 16: I give the other party a chance to express themselves without interrupting or showing impatience. |
| 3(a): Make suggestions that are relevant from the other negotiator's perspective. | ISQ 37: Make suggestions relevant to the topic under discussion. |
| 3(d): Skillfully use facts and data to justify a position. | NSQ 31: I win points with skillful use of logic and reason. |
| Tr. Ex. 125, p. 13 | Tr. Ex. 125, p. 13 |
| 5(f): Use breaks and caucuses appropriately. | NSQ 49: I suggest a break or caucus when a situation gets overheated. |
| Tr. Ex. 125, p. 14 | Tr. Ex. 125, p. 14 |

| Tactical Checklist – Framing | Key Tactical Choice Points – Preliminary Stage |
|---|---|
| **Authority to Finalize an Agreement** | **My Authority to Finalize an Agreement** |
| •    Will you assess authority level? | •    Will you inform the other party or leave the issue ambiguous or unaddressed? |
| •    How will you react if their authority level is ambiguous or less than your own? | **Their Authority** <br> •    How will you react if the other party's authority is ambiguous or less than your own? |
| **Managing Readiness Disputes** | **Location** |
| •    Where do you plan to negotiate – your office, their office, neutral location? | •    Do you prefer your office, their office, neutral location? |
| •    What space, seating arrangements, or electronic support should be arranged? | **Physical Setting** <br> •    What needs do you have involving space, seating arrangements, electronic support, and so on? |
| •    Do you want to stipulate, accept, negotiate, or leave the deadline ambiguous? | **Deadlines** <br> •    Will you stipulate, accept, negotiate, or leave ambiguous |
| Tr. Ex. 125, p. 56 | Tr. Ex. 125, p. 56 |

| ASP's "C2I" | SMS's "PPI" |
|---|---|
| Influence Skills Inventory | Influence Style Questionnaire |
| First, we ask you to assess your own frequency of use by completing a "self-rating" involving a situation where you are effective and productive with a specific colleague | Identify an associate (peer, direct report, supervisor, client, and so on) with whom you have a productive working relationship. |
| [A scale for the questionnaire is included ranging from "seldom" to "average amount" to "frequently"] | [A scale for the questionnaire is included ranging from "rarely" to "average amount" to "frequently"] |
| Tr. Ex. 126, p. 5 | Tr. Ex. 126, p. 5 |
| "Self-Rating" chart with questions asking "How Often Do I", and providing radio buttons to answer on the above-mentioned scale of 1-5.<br><br>Tr. Ex. 126, p. 6 | "Self-Rating" chart with questions asking "How Often Do I", and providing radio buttons to answer on the above-mentioned scale of 1-5.<br><br>Tr. Ex. 126, p. 6 |

| Task 3: Select at least five people to complete an Influence Skills Inventory for you | Task 2: Select 5 people to complete ISQs for you |
|---|---|
| Choose people who are important to you or who are involved with you . . . Consider:<br>• The colleagues who you referred to when you completed your "Effective and "Needs Improvement" self-ratings<br>• Any team member from your own business unit . . .<br>• Team members from other functions or business units<br>• Your immediate manager<br>• Your immediate direct reports . . .<br>• Important external working relationships (customers, client contacts) | Choose people who are important for you to influence, including:<br>• The two people in the Critical Influence Situations you identified I [sic] completing Assignment 1 (strongly recommended)<br>• People who observe or work with you in situations where your skill in dealing with other people is important. They may be managers, direct reports, customers, clients, or peers. You may include someone who knows you well outside of work, such as a family member or someone in your community. |
| Tr. Ex. 126, p. 16 | Tr. Ex. 126, p. 16 |
| [Graph showing the frequency with which participants use different influence-style behaviors]<br><br><br>Tr. Ex. 126, p. 19 | [Graph showing the frequency with which participants use different influence-style behaviors]<br><br><br>Tr. Ex. 126, p. 19 |

| ASP's "CI" | SMS's "PII" |
|---|---|
| Program Introduction<br><br>• "On the Table" – What did you bring?<br>Tr. Ex. 127, p. 23 | Introductions<br><br>What innovation or idea for change have you brought with you?<br>Tr. Ex. 127, p. 23 |
| The Progress of an Initiative<br><br>Use the formal approval process or work informally?<br><br>What the research tells us:<br><br>• "It is better to beg forgiveness than ask permission" . . .<br><br><br><br><br><br><br><br><br><br>Tr. Ex. 127, p. 24 | The Innovation Process<br><br>[Top-down graphic uses "formal approval" when describing end result]<br><br>Innovation Research Bulletin No. 2:<br><br>While many innovations proceed through normal channels of approval, many other innovations will not be successfully implemented unless they proceed through informal channels. Idea champions often find that "it is better to beg forgiveness than permission".<br><br>Tr. Ex. 127, p. 24 |

| | |
|---|---|
| Building a Stakeholder "Coalition"<br><br>But acting alone is almost always unnecessarily risky. To help manage and moderate the risk, champions typically build an informal network or team – and occasionally a more formal group with a project focus – of some of these stakeholders, which we will call a "coalition".<br><br>What are some possible advantages that a coalitions [sic] can provide to the idea champion? List them here:<br>Tr. Ex. 127, p. 64 | A coalition is an informal team or network of supportive people working together on a project. Innovators working in organizations can seldom accomplish everything by themselves.<br><br>Why are coalitions so important to idea champions? What are their benefits?<br><br><br><br><br>Tr. Ex. 127, p. 64 |
| Sources of Resistance and Champion's Effective Response<br><br>Reduce Uncertainty, open the process<br><br>Identify and acknowledge legitimate interests<br><br>Use your coalition to educate about competition, the market, customer needs<br><br>Provide ways of retaining control<br><br>Work to overcome negative history<br><br>Seek ways to reduce discomfort<br><br>Others?<br>Tr. Ex. 127, p. 72 | Reduce uncertainty and surprise.<br><br>Facilitate new learning.<br><br>Allow people to retain some control.<br><br>Minimize disruptions and differences.<br><br>Overcome negative history.<br><br>Deal with real threats.<br><br><br>Tr. Ex. 127, p. 72 |

*Willfulness*

"Infringement is willful when the infringer knew or should have known that [his] action was copyright infringement." *Fitzgerald v. CBS Broad. Inc.*, 491 F. Supp. 2d 177, 180 (D. Mass. 2007). Here, I have no doubt that the copying was not only substantial, but also willful. It is inconceivable that defendants, who had years of experience in their prior employment at SMS with the quest to protect SMS's copyrights from plagiarism or misuse by third parties, would not have known that their nearly verbatim copying of SMS's workbooks constituted deliberate infringement.[3]

*Damages*

As an alternative to an award of actual damages and the profits of the infringer, a plaintiff may "elect, at any time before final judgment is rendered, to recover . . . an award of statutory damages for all infringements involved in the action, with respect

---

[3] This is especially true in Harwood's case as he testified to having been responsible for copyright registration and protection matters at SMS during his 19 years with the firm. SMS points to the failure of ASP to produce either Moore or Shklarek (who had been subpoenaed by SMS, but were beyond the court's jurisdiction to compel attendance) as witnesses at trial, together with ASP's evasive conduct during discovery, as further evidence of willfulness. Harwood, who did testify, attributed the authorship of the infringing material to his absent partners and professed ignorance of the creative process they had used in assembling the works. The court also notes Judge Young's observation that ASP's failure to cooperate with inspection and discovery invited an inference of willfulness sufficiently strong to inform a jury of the circumstances. *See* No. 06-11557 (April 6, 2007).

to any one work . . . in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). SMS has made such an election in this case. Furthermore, the court has the discretion to award as much as $150,000 upon determining that the infringement was committed "willfully." *Id*. § 504(c)(2).

The court has broad discretion in determining the amount of statutory damages. *Venegas-Hernandez v. Sonolux Records*, 370 F.3d 183, 190 (1st Cir. 2004). Some of the factors that may be considered are: "(a) The nature of the infringement; (b) The defendant's purpose and intent; (c) The profit that the defendant reaped, if any, and/or the expense that the defendant saved; (d) The revenue lost by the plaintiff as a result of the infringement; (e) The value of the copyright; (f) The duration of the infringement; (g) The defendant's continuation of infringement after notice or knowledge of copyright claims; and (h) The need to deter this defendant and other potential infringers." *Sony BMG Music Entm't v. Tenenbaum*, 721 F. Supp. 2d 85, 93 n.6 (D. Mass. 2010).

With respect to the first four factors, the copying was large-scale and predatory, and was intended to be used in direct competition with SMS, indeed, was targeted at many of SMS's existing customers. With respect to the fifth factor, the copied works are valuable, having earned over $50 million in revenue for SMS over the years. With respect to the sixth and seventh factors, the infringement was carried out for over two and a half years, two of which, as SMS notes, occurred after SMS served a cease and

desist letter.[4]

Based on the above factors, an award to SMS of $30,000 in statutory damages for each of the three infringed works at issue is merited ($90,000 in the aggregate). Moreover, because the infringement was blatantly willful, the court will, in the exercise of its discretion, make a maximum statutory award of $150,000 on each of the works ($450,000 in the aggregate).

### Attorneys' Fees

The Copyright Act allows "full costs" and a "reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. Whether to award attorneys' fees is a matter for the court's discretion. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 534 (1994). "There is no precise rule or formula for making these [fee award] determinations, but instead equitable discretion should be exercised in light of the considerations we have identified." *Id.* (non-exclusive factors that may guide a court's discretion in awarding attorneys' fees include frivolousness, motivation, objective unreasonableness, and the need in particular circumstances to advance considerations of compensation and deterrence "so long as [they] are faithful to the purposes of the Copyright Act." *Id.* at 534 n.19 (internal citations and quotations omitted)).

---

[4] The eighth factor has less relevance given the absence of evidence that there is a widespread practice of plagaristic copying among competitors in the corporate training market.

The court has found that ASP willfully infringed SMS's copyrights, therefore SMS is a "prevailing party" for purposes of the Act. The court in its discretion also finds that an award of attorneys' fees is warranted in the interests of compensating SMS for its losses and to deter ASP's principals from engaging in similar infringing conduct in the future.

## Injunctive Relief

The Copyright Act explicitly authorizes injunctive relief for copyright infringement: "Any court having jurisdiction of a civil action arising under this title may, subject to the provisions of section 1498 of title 28, grant temporary and final injunctions on such terms as it may deem reasonable to prevent or restrain infringement of a copyright." 17 U.S.C. § 502(a). "A finding of liability for copyright infringement, combined with the threat of future infringement, justifies the imposition of a permanent injunction." *Cipes v. Mikasa, Inc.*, 404 F. Supp. 2d 367, 371 (D. Mass. 2005); s*ee also United States v. Mass. Water Res. Auth.*, 256 F.3d 36, 51 n.5 (1st Cir. 2001) ("At least with respect to some statutory injunction provisions . . . when Congress decides to make available the remedy of injunction for violations of a statute's substantive provisions, irreparable injury is presumed to flow from such violations."). The court finds that a threat of future infringement remains, in light of the repeated current and past acts of ASP's principals. Thus, the court will grant SMS's motion for a permanent

injunction.

ORDER

Judgment will be <u>GRANTED</u> to SMS on its Complaint for copyright infringement.  SMS is awarded enhanced statutory damages in the amount of $450,000.  It is further <u>ORDERED</u> that ASP, its principals, officers, agents, servants, employees, attorneys, successors, assigns and others in privity, or acting in concert therewith, are enjoined from copying, using, selling, marketing, distributing, publishing, performing, displaying, or otherwise infringing any of SMS's rights in its copyrighted works.  SMS may submit an application for its costs and reasonable attorneys' fees within thirty (30) days of the date of this Order.  ASP will have fourteen (14) days to file an objection.


SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE